UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT HULET,

      Plaintiff,

v.                                                                                            Case No. 1:06-CV-707

HARTFORD LIFE AND ACCIDENT                                    HON. GORDON J. QUIST
INSURANCE COMPANY,

      Defendant.
_____/

# OPINION

Plaintiff, Robert Hulet ("Hulet"), has sued Defendant, Hartford Life and Accident Insurance Company ("Hartford"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461, for review of Hartford's denial of long-term disability ("LTD") benefits. Hulet alleges that Hartford improperly denied him disability benefits and that its decision to do so was arbitrary and capricious. The parties have filed cross motions for entry of judgment based upon the administrative record pursuant to the procedure set forth in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), for determining ERISA denial of benefits claims. For the reasons set forth below, the Court will grant Hartford's motion, deny Hulet's motion, and enter judgment affirming Hartford's decision to terminate benefits. The Court will also deny without prejudice Hartford's request for judgment against Hulet to recover overpayment of benefits that Hartford paid to Hulet.

**Facts**

Hartford provides long term disability (LTD) benefits to employees of ZFS Teamwork, LLC ("ZFS Teamwork") pursuant to Group Disability Policy No. GLT-688672, effective July 1, 2002 (the "Policy"). Hartford also apparently administers ZFS Teamwork's short term disability plan, which is not in issue in this case.

The Policy provides that participants are entitled to monthly long-term disability benefits if they satisfy various conditions, including being disabled within the meaning of that term as it is defined by the Policy. The Policy defines "Disability or Disabled" as:

> during the Elimination Period and for the next 24 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.
>
> Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

(Administrative Record ("A.R.") at 29.) "Your Occupation" is defined as "your occupation as it is recognized in the general workplace" but it "does not mean the specific job you are performing for a specific employer or at a specific location." (*Id.* at 31.) "Any Occupation" is defined as:

> an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the

2

> product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(A.R. at 28.)  Thus, as is the case with many disability insurance policies, the Policy contains a two-tiered definition for disability, imposing the narrower "own occupation" requirement initially, and the broader "any occupation" requirement after the first two years.

Hulet was employed by ZFS Teamwork as a Plant Operator from July 8, 1996, until July 28, 2002, when he stopped working due to problems with his left shoulder.  His responsibilities, which included equipment operations, hourly process readings, cleanup, and boiler and cooler tower operations and training, required occasional lifting, carrying, pushing, and pulling up to 100 pounds or more.  The position also required frequent reaching above shoulder and at waist level, climbing ladders, using power tools, and working on equipment.

Hulet had a history of complex problems with his left shoulder dating back to the 1990s, beginning with surgery to remove a cyst that was impinging upon a suprascapular nerve.  He also had a history of absent left pectoralis muscle.  In 2002 Hulet sought treatment for left shoulder pain and instability, describing its condition as "sloppy."  (A.R. at 579.)  On July 29, 2002, Dr. William W. Schwab, M.D., performed an open inferior capsular shift surgery in order to improve Hulet's shoulder stability.  (A.R. at 561.)  In connection with that surgery, Hulet applied for, and received, short-term disability benefits.  Dr. Schwab kept Hulet on disability throughout the elimination period due to his pain and instability in his left shoulder.

Hulet received short-term benefits through February 2, 2003.  At the conclusion of that period, Hulet applied for long-term disability benefits under the Policy.  Dr. Schwab indicated that Hulet could perform only one-arm, sit-down work.  (A.R. at 592-595.)  Hartford determined that

3

these limitations precluded Hulet from performing his own occupation as Plant Operator and, on January 31, 2003, granted his application for benefits to commence on February 3, 2003. (A.R. at 587-590.) Due to his left shoulder condition, Hulet's doctors limited his activities throughout the "own occupation" period to right-arm work only, which precluded Hulet from performing his occupation of Plant Operator.

Hulet continued to complain about instability in his shoulder, and on February 19, 2003, Dr. Schwab performed an arthroscopic surgery to attempt to secure joint stability and repair an abnormality of the labrum. (A.R. at 562.) In a follow-up examination on April 10, 2003, Dr. Schwab noted that Hulet was having continuing problems with range of motion and strengthening of his shoulder. Dr. Schwab commented that he was not sure that he could do anything else for Hulet and that it was unlikely that Hulet would ever return to his position of Plant Operator, but he wanted his partner, Dr. Tom Matelic, to see Hulet to have a "fresh set of eyes" review Hulet's condition. (A.R. at 561.)  Dr. Matelic saw Hulet on May 14, 2003, and found instability both inferiorly and anteriorly. He recommended a second capsular shift procedure and capsular splitting approach. (A.R. at 560.) Hulet underwent the capsular shift surgery on June 5, 2003.

Following the June 5, 2003, surgery, Hulet continued to have pain in his shoulder, for which he took Norco, Darvocet, and other medications. (A.R. at 423-24.) On December 1, 2003, after reviewing a recent MRI, Dr. Matelic noted his concern that Hulet's shoulder condition would lead to "glenohumeral arthrosis." He noted that there was not much else that his office could do for Hulet and suggested a referral to a shoulder expert for a third opinion. (A.R. at 497.) On March 4, 2004, Dr. Michael A. Cheek, M.D., examined Hulet's shoulder. Dr. Cheek concluded that the tightening of the capsule to correct the instability had led to increased joint reactive force, which caused

4

disabling pain.  Dr. Cheek suggested fusing the shoulder joint for pain control, but Hulet declined the surgery.  (A.R. at 474.)

Hulet saw Dr. Matelic on July 19, 2004, at which time Dr. Matelic noted that Hulet was complaining of pain in his right shoulder related to overuse due to the fact that the pain in his left shoulder required him to use only his right hand and arm.  Dr. Matelic concluded that his office had done everything possible to treat Hulet and, finding Hulet permanently disabled, concluded that Hulet should continue under his present work restrictions.  (A.R. at 440.)  One week later, Dr. Matelic completed a Physical Capabilities Evaluation Form for Hartford, in which he confirmed that Hulet was permanently restricted to right arm work only.  (A.R. at 340.)

By letter dated August 2, 2004, Hartford reminded Hulet that in order to be entitled to continuing benefits under the Policy on and after February 3, 2005 (the first day of the "any occupation" period), Hulet would have to be considered totally disabled under the second portion of the Policy's definition.  Hartford advised Hulet that it was beginning an investigation into Hulet's eligibility for benefits under the "any occupation" requirement.  (A.R. at 455-456.)  In connection with that investigation, Lana Sellner, a Clinical Case Manager for Hartford, prepared an Employability Analysis Report using Dr. Matelic's July 26, 2004, Physical Capabilities Evaluation Form and Hulet's work experience for ZFS Teamwork.  Based upon that information, Ms. Sellner concluded that "Mr. Hulet does not possess the transferable skills required to perform any occupation based upon this analysis."  (A.R. at 390.)  Subsequently, Ms. Sellner updated her findings using Hulet's prior employment experience and concluded in an amended report that, based upon the permanent limitation of right-arm work only, Hulet had the transferrable skills to perform three

5

occupations that did not require the use of both arms: (1) Supervisor, Assembly Stock; (2) Case Aide; and (3) Surveillance System Monitor. (A.R. at 378.)

Based upon Ms. Sellner's assessment, Hartford concluded that Hulet would not be disabled under the Policy on and after February 3, 2005, because he would not be disabled under the "any occupation" standard. Hartford notified Hulet of its decision by letter dated December 10, 2004, in which it indicated that Dr. Matelic had restricted Hulet from using his left shoulder in any capacity but that Dr. Matelic had confirmed that Hulet was capable of performing work with his right shoulder and arm without any restriction or limitation. Hartford also cited the three occupations identified in the employability assessment and concluded:

> It is our determination that the weight of the medical evidence in your file does not support symptoms and impairments of such a severity as to prevent you from performing Any Occupation. Therefore, you will not meet the definition of Disability beyond February 2, 2005 and your claim will be closed as of February 3, 2005.

(A.R. at 375.)

Hulet appealed Hartford's determination in a letter dated December 13, 2004. In his appeal, he pointed out that he was taking Provigil, prescribed by Dr. Addy, for narcolepsy; that he could not get the proper dosage of medication for his pain due to his lack of insurance; and that he was developing problems with his right shoulder. He also disputed his qualifications for the three occupations identified in Hartford's denial letter. (A.R. at 368-369.) Hulet did not submit any additional evidence in support of his appeal. Hartford affirmed its decision in a letter to Hulet dated January 31, 2005. Regarding the additional restrictions that Hulet identified, Hartford stated:

> In order for us to evaluate your ability to perform any occupation, we must have a clear understanding of your functional capabilities and limitations. While the medical records contained in your claim file document your complaints of right

> shoulder/elbow pain and daytime sleepiness, we have not been provided with any evidence to reflect that your physicians have placed any limitations on your activities as a result of these conditions. The only restriction/limitation that we have received from your physicians is that you should not use your left arm. Therefore, this is the only restriction that we can consider when evaluating your claim.

(A.R. at 364.) Hartford also stated that it had consulted with a Rehabilitation Clinical Case Manager at Hartford regarding Hulet's concerns with the occupations identified in the employability analysis and confirmed that those occupations would not require use of both arms or any special bonding, as Hulet had asserted.

On February 2, 2005, Amy Boys, a Hartford Appeal Specialist, notified Hulet that Hartford was reopening his appeal to consider additional evidence that Hulet had submitted to Hartford after it had issued its January 31, 2005, decision upholding its denial of benefits. The additional information consisted of a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) that Dr. Matelic completed on January 26, 2005 (erroneously dated January 26, 2004). In this latest report, Dr. Matelic specified additional restrictions on standing, walking, and sitting and imposing restrictions on environmental conditions such as temperature extremes, vibrations, and humidity/wetness. (A.R. at 356-358.)

On February 4, 2005, the Social Security Administration ("SSA") issued its decision finding that Hulet was disabled pursuant to the requirements of the Social Security Act and awarding Hulet benefits. Hulet's attorney provided a copy of the decision to Hartford on February 8, 2005.

In connection with the reopened appeal, Hartford obtained Dr. Matelic's office notes of Hulet's January 26, 2005, visit. Dr. Matelic wrote that Hulet's "physical examination is really unchanged from previously," and that the purpose of the session was to fill out his disability form. (A.R. at 329.) Hartford also sent Dr. Matelic additional questions regarding changes in Hulet's

7

physical condition that would support the new increased limitations, current medications, and his ability to perform sedentary/light work for 8 hours per day with restrictions. Dr. Matelic's office contacted Hartford on March 7, 2005, stating that Dr. Matelic had filled out the most recent restrictions and limitations himself and that Dr. Matelic had said that Hulet's pain was jarring every time that he tried to walk and was affecting Hulet's concentration. Dr. Matelic's office also confirmed that Hulet was not on any medications for pain. (A.R. at 278.)

Hartford also decided to obtain an independent medical records review by George Ousler, M.D., an orthopedic surgeon. Dr. Ousler reviewed various records, including Dr. Cheek's report of March 4, 2004, and office notes from Drs. Schwab and Matelic. Dr. Ousler also attempted to speak with Dr. Matelic, but Dr. Matelic apparently did not return his calls. Dr. Ousler summarized his review as follows:

> Based on review of the medical records, it is felt that Mr. Hulet remains significantly impaired with regards to left shoulder function based on significant active loss of motion. However, based on the evaluation by Dr. Sheek [sic], in March of 2004, it is felt that Mr. Hulet has sedentary to light work capability involving the left shoulder and work activities, which requires repetitive forearm and hand motion, such as assembly work involving small objects. The suggestion contained in the Employability Analysis Report suggests supervisory work, case management or surveillance system monitoring is acceptable. Total restriction of the left arm and shoulder motion is not necessary based on recent evaluation in 2004, despite significant loss of motion to the left shoulder associated with minimal pain within the active motion to the left shoulder. Therefore, lifting with the left forearm up to 10-15 lbs without associated significant shoulder motion is acceptable and such restrictions of lack of motion would not affect his concentration in regards to pain nor would this activity increase shoulder pain or effect work capacity.

(A.R. at 288.) Hartford sent a letter to Dr. Matelic requesting his comments on Dr. Ousler's conclusions, but Dr. Matelic did not respond.

8

On April 12, 2005, Hartford sent a letter to Hulet informing him of its decision to uphold its determination that Hulet was not entitled to benefits. Hartford's letter summarized the basis for its decision, including Dr. Ousler's opinion and the absence of any "documented change in function or pathology to the left shoulder that would significantly increase restrictions since July of 2004," as imposed by Dr. Matelic. (A.R. at 279.) Hartford confirmed that it had sought input from Dr. Matelic, but for whatever reason he failed to respond.

On April 28, 2005, Hulet sent another letter to Hartford appealing its denial of benefits. Among other things, Hulet stated that Dr. Ousler's conclusion that Hulet was not on pain medication was incorrect because while Dr. Matelic would not prescribe pain medication, Hulet's primary care physician had prescribed Darvocet. (A.R. at 274.) In connection with its second review, Hartford obtained updated notes from Dr. Cheek for January and April 2005 office visits regarding pain in Hulet's right shoulder. Dr. Cheek diagnosed persistent right shoulder pain secondary to impingement syndrome and prescribed a corticosteroid injection to help reduce the pain. However, he did not limit or restrict Hulet's use of his right shoulder. (A.R. at 261-262.) Hartford also obtained updated medical records from Hulet's primary care physician, Dr. Scott Johnson, D.O., which confirmed that Dr. Johnson had prescribed pain medication for Hulet.

Hartford sought a second independent medical records review, which was conducted by Dr. Barry Turner, M.D., a board certified orthopedic surgeon. Dr. Turner noted that he had reviewed various medical records and had contacted Dr. Cheek, Dr. Johnson, and a physician's assistant in Dr. Johnson's office. He attempted to speak with Dr. Matelic, but Dr. Matelic indicated that he did not wish to discuss the situation any further with reviewing physicians. (A.R. at 219.) Dr. Turner noted that Dr. Johnson's notes from a March 18, 2005, office visit indicated a normal neurologic exam,

9

movement of all extremities with grade 5/5 strength and no tremors, normal sensation to vibration and touch, and normal deep tendon reflexes. In conversations with Dr. Johnson's office, Dr. Johnson stated that his notes were in error, but the physician's assistant confirmed that the notes were correct. Dr. Turner noted that Dr. Johnson's notes from a subsequent examination on April 21, 2005, were consistent with his notes of the March 18, 2005, exam and therefore suggested that Dr. Johnson's office notes were correct. (A.R. at 222.) Dr. Turner stated that neither Dr. Cheek nor Dr. Turner's physician's assistant detected atrophy in Hulet's left shoulder, and he opined that "anyone with significant pain, limited range of motion, or impairment of a shoulder would have some observable atrophy present." (A.R. at 222.) Dr. Turner indicated that Dr. Cheek had agreed that if Hulet had no atrophy and was using his shoulder appropriately, he would be capable of sedentary or light work. Dr. Johnson's physician's assistant also agreed with this assessment. (A.R. at 222.) Finally, Dr. Turner noted that Dr. Matelic observed no change on physical examination in January 2005 and that Dr. Johnson's notes confirm the additional restrictions that Dr. Matelic imposed were not appropriate. Dr. Turner concluded that if Hulet were taking only two pain pills per day and had no evidence of atrophy in his shoulder, there was "no evidence of significant impairment or significant pain regarding his left shoulder, and no reason to preclude him from working." (A.R. at 223.) Dr. Turner requested comments from Dr. Cheek and Dr. Johnson's physician's assistant regarding his summary of their discussions, but they apparently did not respond.

On August 4, 2005, Hartford again sent Hulet a letter notifying him of its decision to uphold the termination of benefits. In explaining the basis for its decision, Hartford referenced both the new medical information and Dr. Turner's medical records review. Hartford provided the rationale for its decision as follows:

> As noted above, there is no evidence of a change to your condition that would support the more restrictive restrictions provided by Dr. Matelic. As Dr. Matelic has refused to discuss his reasons for providing these restrictions, we are left to evaluate your claim based on the available medical record, which does not support these restrictions. Dr. Johnson, Dr. Cheek, and the physician's assistant have all indicated that you have the ability to perform a sedentary to light duty occupation. Based on documentation available, we considered the claim file with restrictions of sedentary to light duty work along with restrictions to your left shoulder.
>
> The EAR that was completed on November 9, 2004 shows that three occupations were identified based on a restriction of right hand work only. Of the occupations identified, two were light and one was sedentary. As such, the occupations identified are within your capabilities and exceed the earnings requirement under the policy. Therefore, the evidence on file shows that you are capable of performing any occupation.

(A.R. at 216.) This was Hartford's final decision. Hulet then filed the instant lawsuit seeking a reversal of Hartford's decision.

## Discussion

**I.      Standard of Review**

A threshold issue the Court must decide is the standard of review that applies to Hartford's decision to discontinue benefits. A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). The *de novo* standard of review applies to both the factual determinations and legal conclusions of the plan administrator. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).

Where the plan clearly confers discretion upon the administrator to determine eligibility or construe the plan's provisions, the determination is reviewed under the "arbitrary and capricious"

11

standard. *Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1248 (6th Cir. 1991). The arbitrary and capricious standard "'is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)); *see also Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991) (noting that administrators' decisions "are not arbitrary and capricious if they are 'rational in light of the plan's provisions'") (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). In applying this standard, the Court must defer to the administrator's interpretation when the plan vests the administrator with discretion to interpret the plan; an administrator's determination will be overturned only upon a showing of internal inconsistency in the plan or bad faith. *Davis*, 887 F.2d at 695. While no particular language is necessary to vest the plan administrator with discretion to interpret the plan or make benefit determinations, the Sixth Circuit "has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'" *Perez*, 150 F.3d at 555 (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1993) (italics and alteration in original)). Moreover, a court may not "merely . . . rubber stamp the administrator's decision," but must actually "exercise [its] review powers." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). A plan administrator's conflict of interest does not alter the standard of review, but is a factor that should be taken into account in determining whether the decision was arbitrary and capricious. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

The parties agree that the arbitrary and capricious standard provides the applicable standard of review in this case, based upon the following language in the Policy:

> **Who interprets policy terms and conditions?**
> We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

(A.R. at 28.) This language is clear that Hartford has discretionary authority to interpret the terms of the Policy and to determine eligibility for benefits. Accordingly, the Court will examine Hartford's decision under the arbitrary and capricious standard.

## II.    Denial of Benefits

Hulet contends that Hartford's decision is subject to reversal for several reasons. First, he contends that Hartford had a conflict of interest which the Court must consider in reviewing Hartford's decision. Hartford asserts that this argument is really one of bias and, therefore, is a procedural challenge that is not properly before the Court. Hartford notes that Hulet never alleged in his complaint that he was making a claim of bias and that Hulet failed to follow the procedure set forth in the ERISA Case Management Order for maintaining a procedural challenge based upon bias. While the Sixth Circuit has recognized an allegation of bias as a "procedural challenge" to the plan administrator's decision as to which the district court may consider new evidence not contained in the administrative record, *see Wilkins*, 150 F.3d at 618, the Court does not interpret Hulet's argument as a procedural challenge. Rather, he merely points out, as the Sixth Circuit has recognized, that a party in the dual role of administrator of an ERISA plan and issuer of the insurance policy under the plan has an inherent conflict of interest, which is only a factor to consider in determining whether the administrator's decision to deny benefits was arbitrary and capricious. *See Kalish v. Liberty*

*Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005). Thus, the Court will consider Hulet's argument in this regard.

Second, Hulet contends that Hartford's decision was arbitrary and capricious because Hartford ignored the determination of the SSA finding Hulet disabled within the meaning of the Social Security Act. The Sixth Circuit has held that an SSA determination to award a participant Social Security benefits does not, standing alone, render the plan administrator's decision to deny benefits arbitrary and capricious, but it is one factor that should be considered in the context of the entire record in applying the arbitrary and capricious standard. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293-94 (6th Cir. 2005) (citing *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527028 (6th Cir. 2003), *overruled on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003), and *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998)). Thus, the Court should consider the SSA's determination along with other evidence in the administrative record.

Third, Hulet contends that Hartford refused to credit the opinions of his treating physicians. He contends that Hartford ignored Dr. Matelic's opinions that Hulet was totally disabled from employment and medical evidence that Hulet's condition was growing worse.

Fourth, Hulet contends that Hartford placed undue weight on the subjective opinions of Drs. Ousler and Turner, who conducted only a paper review and did not physically examine Hulet. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003), the Supreme Court held that, unlike the rule in Social Security cases, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Id.* at 825, 123 S. Ct. at 1967. On the other hand, a "plan administrator my not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Evans v. UnumProvident Corp.*, 434 F.3d

866, 877 (6th Cir. 2006). Furthermore, an administrator's decision to conduct a file review does not, per se, require a finding that the administrator acted improperly, but it is a factor to consider in applying the arbitrary and capricious standard. *See Calvert*, 409 F.3d at 295.

Finally, Hulet contends that Hartford acted improperly by requesting that an employability analysis review be re-conducted to consider Hulet's prior work experience.

Based upon its review of the evidence in the administrative record, the Court concludes that Hartford's decision to deny Hulet disability benefits under the Policy's "any occupation" definition of disability was supported by substantial evidence and based upon a reasoned explanation. Initially, Hartford approved Hulet's request for benefits, finding that he was disabled under the "own occupation" standard based upon the medical opinions of Hulet's physicians and the limitation that they imposed of right-arm work only, which disabled Hulet from performing his duties as Plant Operator. Although Hulet complained of other conditions during the "own occupation" period, such as right shoulder pain and sleep difficulties, the medical evidence supported only the limitations on Hulet's left shoulder activities. In fact, in his July 26, 2004 Physical Capacities Evaluation Form, which Hartford used to determine Hulet's eligibility for benefits under the "any occupation" standard, Dr. Matelic restricted Hulet to "right arm work only." (A.R. at 340-341.) Dr. Matelic's office confirmed in an October 15, 2004, phone call that Hulet was capable of right arm work without restrictions. (A.R. at 374.)

It was not until January 2005, after Hartford initially decided that Hulet was not entitled to benefits under the "any occupation" standard, that Dr. Matelic imposed greater restrictions upon Hulet which rendered him disabled. Hartford declined to accept Dr. Matelic's new restrictions for several reasons. First, at the time of the January 26, 2005, examination, Dr. Matelic noted that

15

Hulet's "physical examination is really unchanged from previously." (A.R. at 29.) Second, in response to Hartford's request for his reasons for greater restrictions, Dr. Matelic referred to the same conditions that had existed during the "own occupation" period that were cited as supporting the right arm work only restriction. (A.R. 357, 340-342.) Finally, Hartford relied upon the opinions of Drs. Ousler and Turner in confirming that there was no documented change in Hulet's condition that justified Dr. Matelic's increased limitations. Essentially, the only basis that Dr. Matelic cited in support of the increased restrictions was Hulet's subjective complaints of pain, which do not constitute objective medical evidence. *See Stano v. Lumbermens Mut. Cas. Co.*, No. 06-CV-10842-DT, 2007 WL 171601, at *4 (E.D. Mich. Jan. 18, 2007) (citing, among others, *Brown v. Nat'l City Corp.*, No. 97-6130, 1998 WL 787084 (6th Cir. Oct. 29, 1998)). Given the lack of medical support for Dr. Matelic's restrictions and the substantial bases upon which Hartford decided not to credit Dr. Matelic's reasons for the increased restrictions, the Court cannot say that Hartford acted in an arbitrary and capricious manner in concluding that Hulet was not disabled under the "any occupation" standard.

It also bears noting that Hartford considered Hulet's sleep issues and his right shoulder pain in evaluating his claim but ultimately concluded that those were not disabling conditions because no physician had imposed limitations based upon those conditions. Hartford also considered the fact that Hulet was taking medication for his pain, but it reasonably concluded that there was no objective medical evidence that the pain was disabling.

Hulet's arguments cited above do not persuade the Court that Hartford's decision should be reversed. First, while acknowledging the inherent conflict under which an insurer such as Hartford

16

operates, the Sixth Circuit has noted that a conflict, alone, is not sufficient to undermine an insurer's determination:

> It is now settled that "'there is an actual, readily apparent conflict . . ., not a mere potential for one,' when the company or plan administrator is the insurer that ultimately pays the benefits." *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005) (alteration in original) (quoting *Killian v. Healthsource Provident Adm'rs*, 152 F.3d 514, 521 (6th Cir. 1998)). But if the conflict of interest did not actually motivate [the insurer's] decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious.

*Pflaum v. Unum Provident Corp.*, 175 F. App'x 7, 10 (6th Cir. 2006). The Sixth Circuit recently reiterated this point in *Cooper v. Life Insurance Co. of North America*, 486 F.3d 157 (6th Cir. 2007), in which it observed that "Sixth Circuit caselaw requires a plaintiff not only to show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Id.* at 165 (citing *Peruzzi*, 137 F.3d 431. While Hartford no doubt was operating under a real conflict of interest, Hulet has failed to point to any evidence showing that this conflict motivated Hartford's decision. In fact, the record shows that Hartford gave Hulet not one, but three opportunities to submit additional evidence in support of his claim and considered all of his evidence.

Similarly, the SSA's finding that Hulet was disabled fails to demonstrate that Hartford acted improperly. Hulet contends that Hartford ignored the SSA's determination in reaching its decision to deny benefits, but there is nothing in the record, other than Hartford's silence regarding the SSA's determination, that suggests Hartford did not consider the SSA's findings. The Sixth Circuit has noted that silence, alone, is insufficient to show that a plan administrator did not consider SSA findings favorable to the participant. *See Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003). In any event, Hartford would be on firm ground in concluding that the

SSA findings do not support Hulet's claim for benefits. A review of the decision reveals that the administrative law judge based his finding of disability not only upon Hulet's shoulder condition, but also upon a finding that Hulet suffered from severe lower back pain due to degenerative disc disease of the lumbar spine. The administrative law judge cited records from Dr. Keith B. Jarvery, M.D., which supported this impairment. Hulet never provided Dr. Jarvery's records to Hartford, and there is little evidence in the record regarding Hulet's low back problems. Moreover, Hulet's physicians did not mention Hulet's low back problems in the forms they submitted to Hartford. While the administrative law judge did cite Dr. Matelic's restrictions and limitations from January 2005, there is no indication the he had Dr. Matelic's prior determinations that Hulet was restricted only to right arm work based upon the same medical evidence. Moreover, the administrative law judge's acceptance of Dr. Matelic's assessment does not mean that Hartford's determination was improper, especially because the SSA's finding must be supported by substantial evidence, which can be found to exist even though there is evidence in the record to support a contrary conclusion. *See Hurse*, 77 F. App'x at 318.

The Court also rejects Hulet's contention that Hartford improperly ignored the opinions of Hulet's treating physicians. As noted above, Hartford accepted the limitations imposed by Hulet's physicians that were supported by objective medical evidence. That is, Hartford credited the restriction that Hulet was limited to working only with his right arm and shoulder. Hartford questioned Dr. Matelic's increased restrictions because they were not supported by objective evidence and because Dr. Matelic failed to adequately explain what had changed to warrant the increased restrictions. Likewise, Hartford did not blindly adopt the opinions of Drs. Ousler and Turner wholesale. Rather, Hartford credited those opinions where they were supported by medical

evidence and rejected them where they were inconsistent with the medical record. For example, regarding Dr. Turner's conclusion that Hulet could use both arms, Hartford's appeal specialist stated:

> While the lack of atrophy is significant in that an individual with severe restrictions should have some signs of atrophy, the opinions of three of Mr. Hulet's examining physicians cannot be ruled out entirely. In the cases of Dr. Johnson, Dr. Cheek and Dr. Matelic, they have all indicated restrictions to the left shoulder. As such, we will continue to evaluate the claim on the basis of restrictions to Mr. Hulet's left shoulder.

(A.R. at 130.)

Finally, the Court rejects Hulet's argument that Hartford acted improperly by having Ms. Sellner conduct another employability analysis using Hulet's prior employment experience. Ms. Sellner's first analysis was based solely upon Hulet's employment with ZFS Teamwork. The second analysis was based upon a longer employment history, which included new information. Although the first assessment concluded that Hulet was disabled from performing any occupation, there is no indication that Hartford conducted the second assessment in order to avoid paying benefits. Rather, it appears that Hartford sought only to base its determination upon all relevant information, which it had the right to do.

**III.   Repayment Of Benefits**

In its brief in support of its motion for judgment, Hartford requests the Court to enter judgment against Hulet in the amount of $5,532.94 as the balance of overpaid benefits that Hulet has not repaid to Hartford. Hulet does not deny that he is liable for such repayment, but he disputes the amount owing. He contends that Hartford's figure does not give him credit for monthly payments that he has made beyond July 2006. Because the amount of unpaid benefits remains an open issue, the Court will deny this aspect of Hartford's motion. However, the Court will require Hartford to file proof of the amount it claims Hulet owes, including credit for all payments that he has made.

**Conclusion**

For the foregoing reasons, the Court will enter judgment on the administrative record in favor of Hartford. The Court will deny without prejudice Hartford's request for judgment against Hulet. An Order consistent with this Opinion will be entered.


Date: September 28, 2007               /s/ Gordon J. Quist
                                      GORDON J. QUIST
                                UNITED STATES DISTRICT JUDGE